## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
|  | : |
|  | : |
|  | : |
| **Plaintiff,** | : |
| **v.** | : |
|  | : |
|  | : |
| **BRUCE D. STREBINGER, BRENT HOWARD CHAPMAN, and MUSKATEER INVESTMENTS, INC.,** | : **Civil Action No.** |
|  | : |
|  | : |
| **Defendants,** | : |
|  | : |
| **and** | : |
|  | : |
| **ANNE STREBINGER,  FURLA BLUE SpA, LANCE INVESTMENTS S.A., AND MUSKATEER INVESTMENTS, INC.,** | : |
|  | : |
|  | : |
|  | : |
| **Relief Defendants.** | : |
|  | : |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, Securities and Exchange Commission ("Commission"), files its

complaint and alleges that:

## <u>OVERVIEW</u>

1.      In 2009 and 2010, Canadian citizens Bruce D. Strebinger ("Strebinger") and Brent Howard Chapman ("Chapman") coordinated a fraudulent scheme relating to the stock of Americas Energy Company-AECo, formerly Trend Technology Corporation ("Americas").

2.      At the time of the scheme, Americas was a U.S. public company with "penny" common stock (the "Stock") quoted on the Over-The-Counter Bulletin Board ("OTCBB").  Americas filed a bankruptcy petition in 2011 and is now being liquidated in Chapter 7 bankruptcy.

3.      In May 2009, Strebinger began facilitating a reverse merger between Americas and a start-up company based in Tennessee.

4.      From and after May 2009, Strebinger and Chapman each directly or indirectly acquired more than 5% of Americas Stock in private transactions without publicly disclosing their beneficial ownerships.

5.      While acquiring the shares of Americas Stock, Strebinger and Chapman also coordinated a massive campaign to promote the Stock through blast e-mails and direct mailings of stock promotion reports authored by third persons.

2

6.     Strebinger and Chapman knew, or were reckless in not knowing, that the promotional reports contained materially false and misleading statements.

7.     The promotion began in September 2009 and continued through April 2010. While the promotion continued and the Stock price soared, Strebinger and Chapman sold their Stock for $17 million through offshore accounts, including accounts with Swiss financial institutions in the names of three entities:  (1) Muskateer Investments, Inc. ("Muskateer"), beneficially owned by Strebinger; (2) Furla Blue SpA ("Furla"), beneficially owned by Strebinger's wife, Anne Strebinger ("Strebinger's Wife"); and (3) Lance Investments S.A. ("Lance"), beneficially owned by Chapman.

8.     The promotion increased investor demand for the Stock and enabled Strebinger and Chapman to reap huge profits through sales of the Stock while simultaneously concealing from investors not only that Strebinger and Chapman owned a significant portion of Americas Stock, but also that it was Strebinger and Chapman who were together marketing and funding a multi-million dollar promotional campaign related to the Stock.

## **VIOLATIONS**

9.     By the conduct described herein, Strebinger and Chapman have engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b), 13(d) and 20(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(d) & 78t(b)] and Rules 10b-5, 13d-1, and 13d-2(a) promulgated thereunder [17 C.F.R. §§240.10b-5, 240.13d-1 & 240.13d-2(a)].

10.     By the conduct described herein, Muskateer has engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2(a) promulgated thereunder [17 C.F.R. §§ 240.13d-1 & 240.13d-2(a)].

11.     By the conduct described herein, Strebinger has engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute aiding and abetting Chapman's violations of Sections 10(b), 13(d) and 20(b) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d) & 78t(b)].

12.    By the conduct described herein, Chapman has engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute aiding and abetting Strebinger's violations of Sections 10(b), 13(d) and 20(b) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d) & 78t(b)].

13.    Strebinger's Wife, Furla, Lance, and Muskateer received proceeds from this scheme and were unjustly enriched thereby.

## JURISDICTION AND VENUE

14.    The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object, for civil penalties and for other equitable relief.

15.    This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

16.     Defendants, directly and indirectly, made use of the mails, the means and instruments of transportation and communication in interstate commerce and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this complaint and made use of mail and means of instrumentality of interstate commerce to effect transactions, or to induce or to attempt to induce the purchase or sale of securities alleged in this complaint.

17.     Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(c)(3) and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because the defendants are foreign citizens and not residents of the United States.

18.     Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

## **THE DEFENDANTS**

19.     **Bruce D. Strebinger**, age 38, is a Canadian citizen who has been residing in Vancouver, Canada.  Strebinger purports to be self-employed in the marketing and promotional field.

6

20. **Brent Howard Chapman**, age 38, is a Canadian citizen who is or has been residing in Antigua.  Chapman was employed in the securities industry in Canada.

21. **Muskateer Investments, Inc.** is an entity incorporated in Nevis that was beneficially owned by Strebinger during the scheme.  Muskateer is also a relief defendant.

## RELIEF DEFENDANTS

22. **Anne Strebinger**, age 39, is a Canadian citizen who has been residing in Vancouver, Canada and is married to Strebinger.

23. **Furla Blue SpA** is an entity incorporated in Nevis that was beneficially owned by Anne Strebinger during the scheme.

24. **Lance Investments S.A.** is an entity incorporated in Panama that was beneficially owned by Chapman during the scheme.

## THE FRAUDULENT SCHEME

### A.    Background and Overview of the Fraud

25. Americas was incorporated in 2001 in Nevada, but it was based in Canada and had Canadian management.  Americas claimed to be in the mineral exploration business.

7

26.     Between 2003 and 2005, Americas issued 10,202,300 shares of Stock in private transactions with 55 individuals, primarily Canadian residents.

27.     In October 2004, Americas, then known as Trend Technology Corporation, filed a registration statement on Form 10-SB to register the Stock under Section 12(g) of the Exchange Act.  In 2006, the Stock began quotation on the OTCBB with the ticker symbol "TRET."  In 2007, Americas effected a forward stock split, which doubled the number of issued shares of Stock to 20,404,600.

28.     By May 2009, Americas was a shell public company that had never earned any revenues and had no material assets or operations.  The last known public trade had occurred in January 2008, with a closing Stock price of $0.25 per share.

29.     By May 2009, Americas had 20,404,600 shares of issued and outstanding Stock owned by a small group of shareholders.  Virtually all of such shares were non-restricted securities.

30.      In May 2009, Strebinger began facilitating a reverse merger between Americas and a private, start-up coal mining and oil and gas exploration business based in Nashville, Tennessee (the "Tennessee Company").  In July 2009, the Tennessee Company incorporated under the name "Americas Energy Company, Inc."

31.     On July 9, 2009, Americas, operating as Trend Technology Corporation, publicly disclosed the proposed merger with the Tennessee Company (the "Merger Announcement").  On September 3, 2009, Americas publicly disclosed its execution of a definitive merger agreement (the "Merger Agreement").  On January 27, 2010, Americas publicly disclosed that the merger was complete.

32.     Before the Merger Announcement, Strebinger and Chapman began directly and/or indirectly acquiring large quantities of Americas Stock in private transactions, for themselves or other persons.

33.     Neither Strebinger nor Chapman publicly disclosed their beneficial ownership, directly or indirectly, of more than 5% of Americas Stock.  Strebinger and Chapman engaged in a course of conduct designed to conceal from the investing public their accumulation of Americas Stock.

34.     Before the Merger Announcement, Strebinger and Chapman also began coordinating a massive campaign to promote the Stock through blast e-mails and direct mailings of stock promotion reports written by third parties.

35.     Strebinger and Chapman knew, or were reckless in not knowing, that the stock promotion reports contained false and/or misleading statements.

36.     The promotion began in September 2009 and continued through April 2010, at a cost of over $3.5 million.

37.     As the promotion continued, and the price for the Stock rose, Strebinger and Chapman directly and/or indirectly sold 6,185,000 shares of Stock on the public market for approximately $17 million.

38.     To sell the Stock, Strebinger used accounts at financial institutions in Switzerland in the names of Muskateer and Furla.  To sell the Stock, Chapman used an account at a financial institution in Switzerland in the name of Lance as well as an individual account held at a brokerage firm located in the Turks and Caicos Islands.

39.     In furtherance of his scheme to defraud, Strebinger clandestinely acquired control of more than 5% of Americas Stock from early Americas shareholders and failed to disclose publicly his ownership of Americas Stock.  Strebinger also failed to disclose publicly his marketing of stock promotion reports that he knew, or was reckless in not knowing, contained materially false and/or misleading statements. While concealing material information from the investing public as to his ownership of Americas Stock and his involvement in the promotional efforts for that Stock, Strebinger simultaneously sold the Stock on the public market through

10

obscured offshore accounts that he and/or his associated entities beneficially owned.

40.     In furtherance of his scheme to defraud, Chapman clandestinely acquired control of more than 5% of Americas Stock from early Americas shareholders and failed to disclose publicly his ownership of Americas Stock.  Chapman also failed to disclose publicly his funding of the distribution of stock promotion reports that he knew, or was reckless in not knowing, contained materially false and/or misleading statements.  While concealing material information from the investing public as to his ownership of Americas Stock and his involvement in the promotional efforts for that Stock, Chapman simultaneously sold the Stock on the public market through obscured offshore accounts that he and/or his associated entities beneficially owned.

41.     Strebinger and Chapman engaged in a deceptive course of conduct designed to promote the Stock to stimulate investor demand while simultaneously depriving the market of information about their significant ownership of Stock available for sale, and then selling their Stock into the market to benefit from the price increase.

42.     Strebinger and Chapman's principal purpose in concealing their ownership of Americas Stock was to allow them to create a false appearance in connection with their efforts to promote Americas Stock.

43.     Strebinger and Chapman each knowingly or recklessly provided substantial assistance to the other by participating in the acquisition and disposition of large quantities of Stock while simultaneously working to pump the Stock through an aggressive stock promotion.

### B.     Strebinger and Chapman's Americas Stock Transactions

44.     By May 2009, Strebinger and Chapman began to acquire Americas Stock in private transactions for themselves or other persons.  The Stock acquisitions were facilitated by an individual who is both a Canadian resident and a Canadian securities attorney (the "Securities Attorney").

45.     The Securities Attorney also was corporate counsel for Americas, a corporate founder, a former Americas officer and director, and a key Americas shareholder in May 2009.

46.     In May 2009, the Securities Attorney owned 29% of Americas Stock, making him the largest single Americas shareholder.  Most of the other Americas shareholders were relatives, friends, or business associates of the Securities

Attorney, or of two Canadian residents who were colleagues of the Securities

Attorney (the "Canadian Colleagues").

47.     By May 2009, Strebinger and Chapman were engaging in transactions

facilitated by the Securities Attorney that involved transfers of a substantial

amount of Americas Stock.

48.     The Securities Attorney facilitated the acquisition by Strebinger, directly

and/or indirectly for Muskateer, of 1,385,000 shares of Americas Stock from 20

Americas shareholders who had purchased their Stock several years earlier in

private placement transactions.  The 20 Americas shareholders were friends,

relatives, or business associates of the Securities Attorney or the Securities

Attorney's Canadian Colleagues.  Muskateer ultimately sold the 1,385,000 shares

of Americas Stock through an account in Switzerland.

49.     Between March 14, 2009 and May 8, 2009, Strebinger wrote 20 checks from

his personal account at a bank in Canada that were made payable to the 20 early

Americas private placement shareholders who collectively owned the 1,385,000

shares of Stock.

50.     The Securities Attorney did not begin distributing these checks to the 20

Americas shareholders until late May 2009.  Between May 26, 2009 and July 17,

2009, Strebinger paid the shareholders a total of approximately CDN$15,385 for their 1,385,000 shares, at prices ranging from $0.008 to $0.0153 per share.

51.     At least seven of the 20 shareholders executed Stock Purchase Agreements provided by the Securities Attorney.  The Stock Purchase Agreements identified Muskateer as the purchaser of the Stock.

52.     On or about May 5, 2009, the Securities Attorney requested that one of his two Canadian Colleagues execute a substantially identical Stock Purchase Agreement for the sale of his 1,000,000 shares of Stock for $15,000 at $0.015 per share.  On or about May 5, 2009, the Canadian Colleague returned an executed Stock Purchase Agreements to the Securities Attorney, representing the sale of all of his Americas Stock.

53.     Strebinger's Wife acquired the 1,000,000 shares of Stock sold by the Canadian Colleague.  Furla, which was beneficially owned by Strebinger's Wife, ultimately acquired the Stock and sold the shares through an account in Switzerland.

54.     At the commencement of Furla's sale of 1,000,000 shares of Americas Stock, the shares represented 4.9% of Americas Stock.

55.     In addition, on or about May 15, 2009, the wife of the second Canadian

Colleague sent the Securities Attorney another Stock Purchase Agreement for the

sale of all of her 1,500,000 shares of Stock for $30,000 at $0.02 per share, then

representing 7.3% of Americas Stock.

56.     On or about May 21, 2009, Chapman wired $54,998.70 to the Securities

Attorney from a bank in Antigua.

57.     On or about June 2, 2009, Chapman sent the Securities Attorney an email

instructing that $30,000 of the wired funds be paid to the second Canadian

Colleague's wife for the sale of 1,500,000 shares of Stock.

58.     In the email, Chapman also instructed the Securities Attorney to deposit the

remaining wired funds into the Americas bank account "as a private placement of

shares @ $0.25 per share" for Bistro Ltd. ("Bistro") in Antigua.

59.     Americas issued 99,995 shares of restricted stock to Bistro on July 8, 2009,

increasing the total issued Stock to 20,504,595 shares.

60.     Chapman was associated with Bistro at all relevant times.

61.     Around or after May 2009, Chapman directly and/or indirectly acquired

3,700,000 shares of Americas Stock in private transactions from four foreign

entities that received their Stock from early Americas private placement shareholders.

62.     Lance, beneficially owned by Chapman, acquired and sold 1,000,000 shares of the Stock through an account in Switzerland, then representing 4.9% of Americas Stock.  Chapman sold the remaining 2,700,000 shares through an individual account in the Turks and Caicos Islands.

63.     Chapman acquired 900,000 of those shares by at least September 4, 2009, then representing 4.4% of Americas Stock.  Chapman acquired 1,800,000 of these shares by no later than December 7, 2009, then representing 8.7% of Americas Stock.

64.     In at least 2009, Strebinger and Chapman each were the direct or indirect beneficial owners of more than 5% of Americas Stock.  Pursuant to Exchange Act Section 13(d) and Rule 13d-1 and 13d-2(a), Strebinger and Chapman were required to file a Schedule 13D with the Commission to disclose publicly their acquisitions and material dispositions of Americas Stock.

65.     Schedule 13D requires public disclosure of, among other things, the names and addresses, countries of citizenship, and principal occupations or employment

of all individuals who have beneficial ownership of 5% or more of the stock of a
public company.

66.     Item 4(a) of Schedule 13D requires public disclosure by any individual, who
has beneficial ownership of 5% or more of the stock of a public company, of "the
purpose or purposes" of stock acquisitions, and any "plans or proposals" that the
acquirer may have "which relate to or would result in" the acquisition "by any
person" of the stock or the disposition of such stock.

67.     Strebinger was the beneficial owner of more than 5% of Americas Stock.

68.     Strebinger did not file a Schedule 13D.

69.     Strebinger failed to disclose publicly that he was a marketer and stock
promoter, that he was coordinating dissemination of promotional reports about the
Stock, that he had accumulated large quantities of Stock directly or indirectly, and
that he was planning to sell such Stock while simultaneously disseminating
promotional reports that urged investors to buy the Stock.

70.     Chapman was the beneficial owner of more than 5% of Americas Stock.

71.     Chapman did not file a Schedule 13D.

72.     Chapman failed to disclose publicly that he was funding the dissemination of
promotional reports about the Stock, that he had accumulated large quantities of

17

Stock directly or indirectly, and that he was selling or planning to sell such Stock while simultaneously disseminating promotional reports that urged investors to buy the Stock.

### C.    Strebinger Facilitates the Merger Discussions

73.    At the same time that he began acquiring Americas Stock, around May 2009, Strebinger began to facilitate the coordination of the proposed merger of Americas and the Tennessee Company.

74.    The merger discussions were facilitated by a California attorney (the "California Attorney").  The California Attorney had represented both Strebinger and Chapman in connection with Americas.

75.    The merger discussions primarily were between the Tennessee Company's senior officer ("Senior Officer") and the California Attorney.  The Senior Officer was seeking capital for the Tennessee Company and recently had been introduced to the California Attorney.

76.    The California Attorney introduced the Senior Officer to Strebinger.  The Senior Officer believed that Strebinger and a colleague of Strebinger's were potential sources of funding for the Tennessee Company and that, upon the merger, Americas would receive a large capital infusion.

18

77.     In June 2009, the California Attorney prepared and the Senior Officer signed a "Binding Letter of Intent" between Americas and the Tennessee Company, which vaguely outlined the proposed merger and referenced $1 million of corporate funding to be provided from an undisclosed source.  On July 9, 2009, Americas publicly disclosed its Merger Announcement.

>    **D.      Strebinger and Chapman Coordinate the Stock Promotion that is Paid for by Chapman**

>    **1.  *The Wollstein Report***

78.     In or around May 2009, Strebinger hired Oklahoma resident Daniel Breckenridge ("Breckenridge") to ghostwrite a report that promoted the Americas Stock in light of the proposed merger.

79.     Under Strebinger's direction, Breckenridge hired California resident Jarret Wollstein ("Wollstein") to be the author of various versions of the report (the "Wollstein Reports").

80.     In June 2009, Chapman wired $59,975 to Breckenridge's company for the reports.  Breckenridge paid Wollstein $10,000.

81.     Breckenridge was the principal drafter of the reports, even though Wollstein was the ostensible author.

82.     During the summer of 2009, Breckenridge worked on an initial draft of a

Wollstein Report under Strebinger's direction.

83.     On August 6, 2009, Breckenridge sent Wollstein an e-mail requesting that

Wollstein review the attached report.  The report referenced "today's $1 share

price," although at that time there was no public trading of the Stock.

84.     Breckenridge stated, in his e-mail to Wollstein:  "Shares of AECX [*i.e.,*

Americas] will open at $1" and "I also have good reason to believe that once

underway, AECX will actively keep investors informed by way of news releases,

which should have a positive effect on the growth of the stock."

85.     Strebinger told Breckenridge that the Stock would open at $1.00.

86.     By early September 2009, Strebinger and Chapman had arranged for a

California marketing firm (the "Marketing Firm") to coordinate the distribution of

the Wollstein Reports via e-mail blasts and mass mailings to proprietary lists of

prospective investors maintained by third parties.

87.     The Marketing Firm scheduled the first e-mail blast of a Wollstein Report

for September 14, 2009 (the "Initial Wollstein Report").

88.    The Marketing Firm also scheduled at least one e-mail blast on almost every business day from September 14, 2009 through February 2010.  E-mail blasts continued sporadically in March and April 2010.

89.    In addition, the Marketing Firm arranged for two mass mailings of the reports in December 2009 and January 2010.

90.    The promotional costs for the Wollstein Reports exceeded $3.5 million. Disclaimers in the Wollstein Reports stated that Bistro funded certain distribution costs of the reports.  However, Chapman and another foreign entity actually paid the costs for the Marketing Firm's promotion of the Wollstein Reports.  The Wollstein Reports did not identify Chapman as having funded the reports.

91.    The Wollstein Reports typically were presented as special alerts by the "Intelligent Investor Report," a monthly newsletter published by Wollstein for paying subscribers.  The reports urged readers to buy Americas Stock immediately and to become a paying newsletter subscriber.

92.    For example, the Initial Wollstein Report contained statements relating to Americas (referred to in the report by its stock ticker symbol TRET) such as:  *"I recommend you start with TRET and buy every share you can get your hands on!;"* "I recommend TRET for a multitude of reasons.  Out of the gate, you could easily

pocket three times your money based on today's entry price;" "In a moment, I'll present to you *pro forma* figures that project how TRET could shoot to an $11 stock in the next 24 months;" and "**I'm projecting TRET to nearly triple your money in 2009**."

93.     Fine-print disclaimers at the end of the Wollstein Reports called the report a "sponsored advertisement," a "paid advertising issue," and not "investment advice."

94.     Despite the reports' recommendations to buy Americas Stock in light of *pro forma* figures, the disclaimers stated that the report "does not purport to provide an analysis of any company's financial position and is not in any way to be construed as an offer or solicitation to buy or sell any security."

95.     The disclaimers in the Wollstein Reports disclosed that Wollstein had been paid $10,000, but the disclaimers did not report the $49,975 payment to Breckenridge.

96.     The Wollstein Reports misleadingly and confusingly referred to the touted company as "Americas Energy Company, Inc.," which was the name of the private Tennessee Company, while urging investors to buy "TRET" and "AENY," which

were the stock ticker symbols for the public company Trend Technology

Corporation later known as Americas Energy Company-AECo.

97.    For example, the Initial Wollstein Report stated:  "**Buy Now:  America's**

**Energy Company** [sic] (**OTCBB:TRET**)."   In addition, the disclaimers stated

that "[m]ore complete information about Americas Energy Company, Inc. is

available from the web site [sic] of the Securities and Exchange Commission, at

http://www.sec.gov."

98.    Americas Energy Company, Inc., however, was a private company and had

not filed any public information with the Commission.  Instead, the only

information available to the investing public on the Commission's website would

have been in the public filings of Trend Technology Corporation, later named

Americas Energy Company-AECo.

99.    The disclaimers also stated that Bistro owned shares of "Americas Energy

Company, Inc." that could be "publicly traded (sold) at any time" by Bistro, when

in fact that was the name of the private Tennessee Company and its shares were

not publicly traded.

100.   In addition, the Wollstein Reports projected escalating prices for the Stock

based on projected company operations for the private Tennessee Company.  For

23

example, the Initial Wollstein Report stated (emphasis as in original):  "**$17.2 million after-tax cash first year!**  As you can see, TRET hits the ground running. According to the *pro forma* business plan posted on the company website, www.americasenergycompany.com production is expected to be profitable in the first year of operation."

101.   Purportedly based on the business plan of the Tennessee Company, the Initial Wollstein Report stated:  "At an extremely conservative valuation, TRET could be trading at $5 or more, especially when you factor in the forward earnings projections!"  Early Wollstein Reports also projected $3.00 "near term" and $11.00 "long term" Stock prices for the public company.  Later reports projected $5.00 near term and $20.00 long term Stock prices for the public company.

102.   Strebinger decided when the Wollstein Reports were final and how and when the reports were distributed.  Strebinger sometimes created and/or reviewed the subject lines for the e-mail blasts.  Moreover, the Marketing Firm sent e-mails to Strebinger and Chapman with updates on the promotion, including preliminary confirmations of the scheduled e-mail blasts.  In the first few weeks of the promotion, the Marketing Firm also provided charts that showed stock price movements before and after the e-mail blasts.

24

## 2. *The Cohen Report*

103.   In September 2009, Strebinger and Chapman also arranged for a self-described independent research firm in California, owned by California resident D. Paul Cohen ("Cohen"), to create and distribute via e-mail another report about Americas Stock (the "Cohen Report").

104.   Strebinger told Cohen that Chapman would pay for the "report and blast." Chapman paid Cohen's company $30,000.

105.   Cohen's company prepared a "Research Services Agreement" dated September 29, 2009.  The agreement stated that Chapman would edit the final draft of the Cohen Report, sign off on the final version, and give permission to distribute the Cohen Report.

106.   At Cohen's request, Strebinger obtained financial and other information from the Tennessee Company to be used for the Cohen Report.  Cohen then forwarded the information to an "analyst" in India.  She drafted the Cohen Report, in exchange for approximately $650.

107.   On October 27, 2009, Cohen sent a draft of the Cohen Report to Strebinger, asking that he edit the report and adding, "Hope you like it."

108.   Strebinger replied, by e-mail dated October 29, 2009:  "you have the wrong number of outstanding shares also I dont [sic] think you bringing [sic] into account the potential of the 350m ton property enough. That property will make this company.  350m tons is 20 billion dollars worth of coal.  That would take this company to levels that no investor would want not to be part of."

109.   By e-mail dated November 5, 2009, Strebinger told Cohen that "the only thing that you have to change is shares outstanding to 37 million then you can release it," and "yeah thats [sic] final lets get it out."

110.   The final 32-page Cohen Report was dated November 5, 2009.  The report was on the letterhead of "Cohen Independent Research Group, Inc." and identified Cohen as the company's President with an address in San Rafael, California.  The letterhead described the company as "Wall Street's #1 Independent Research Firm."  In November 2009, Cohen arranged for the report to be posted on his company's website and blasted to prospective investors via e-mail.

111.   Like the Wollstein Reports, the Cohen Report misleadingly identified "Americas Energy Company, Inc." as the featured company while at the same time identifying the stock symbol as "TRET.OB."

112.   In a front-page section titled "Investment Thesis & Recommendation," the Cohen Report concluded that Americas was "a compelling investment opportunity for long term investors who wish to capitalize on improving fundamentals of the coal industry."

113.   Like the Wollstein Reports, the Cohen Report projected a $3.00 per share "Short Term Price Target."  The Cohen Report also projected a $5.10 per share "Long Term Price Target."

114.   Page 18 of the Cohen Report indicated that the price targets were calculated using a "Discounted Cash Flow Analysis (DCF)" and that the "formula" used to calculate the "DCF Price Targets" was on page 17 of the report.  Page 17 of the report, however, contained two charts relating only to long term price targets, and the charts did not adequately describe any purported valuation "formula."

115.   Furthermore, it was the analyst in India, and not Cohen, who was responsible for the stock price targets, and Cohen did not know what valuation formula, if any, was used.

116.   Cohen merely purchased the report from the analyst and edited the report for grammar changes; Cohen's company did not actually perform the purportedly independent research.

117.   The last two and one-half pages of the Cohen Report consisted of fine-print disclaimers.  Among other things, the disclaimers stated that "Cohen Independent Research Group, Inc. (CR) distributes report/release/advertisements and other Information [sic] purchased and compiled from outside sources and analysts," and that the "report/release/advertisement is an advertisement."

118.   The disclaimers stated:  "Do not base any investment decision on information in this report."  The disclaimers also stated that "[I]nvestor awareness distribution programs can materially affect the price of the company's stock."

119.   In addition, the disclaimers stated:  "Brent Chapman has paid $30,000 for this report/release/advertisement and its distribution."

> **E.   Strebinger and Chapman Knew, or Were Reckless in Not Knowing, that the Wollstein and Cohen Reports Contained Materially False and Misleading Statements**

120.   Strebinger and Chapman effectively used Breckenridge, Wollstein, Cohen, and their affiliated entities to create the Wollstein Reports and the Cohen Report, and then Strebinger and Chapman arranged for and funded the broad dissemination of the reports to prospective investors.

121.   Strebinger and Chapman knew, or were reckless in not knowing, that these reports contained materially false and misleading statements, including the false and misleading statement set forth below.

### 1. *False and misleading statements in the Wollstein Reports*

122.   First, although the disclaimer in the Initial Wollstein Report stated that Bistro had 1,000,000 shares that could be publicly sold at any time, the disclaimer was misleading because it failed to disclose the following facts:  1) that Bistro was associated with Chapman; 2) that Chapman and his colleague Strebinger directly or indirectly owned many millions of shares of Americas Stock; 3) that Chapman and Strebinger were marketing and funding the stock promotion; and 4) that Chapman and Strebinger directly or indirectly were in fact already selling large quantities of their Stock while simultaneously causing reports to be widely disseminated that urged investors to buy the Stock.

123.   Strebinger and Chapman each knew, or was reckless in not knowing, that substantial shares of Stock were being actively sold for their benefit during the stock promotion.

124.   Second, as the dissemination of the Wollstein Reports progressed, the disclaimers misleadingly reported the distribution costs.  The Initial Wollstein

Report reported $72,000 of distribution costs to new subscribers.  For subsequent reports disseminated by e-mail blasts, the disclaimers identified distribution costs ranging from $50,000 to $184,000.  For reports disseminated by mass mailings, the disclaimers identified distribution costs of $700,000.  However, total promotional costs exceeded $3.5 million.

125.   As the promotion continued and the distribution costs increased, investors increasingly were misleadingly informed about the enormous amounts being spent to promote the Stock.  Strebinger and Chapman knew the enormous costs of the distribution and knew, or were reckless in not knowing, that the disclaimers in the Wollstein Report about the distribution costs were not accurate.

126.   Third, the disclaimers falsely and/or misleadingly reported the source of the distribution costs.  Although the disclaimers stated that Bistro paid for the distribution costs, at least 37% of the expenses were paid by Chapman.  There is no evidence that Bistro itself paid for any distribution costs.

127.   Therefore, while the disclaimer stated that certain costs of the promotion had been paid for by Bistro, which purportedly held 1,000,000 shares of Stock that could be sold at any time, in fact, Chapman had paid for a substantial part of the

distribution and he owned millions of shares of Stock that he was selling in large amounts during the promotion.

128.   Fourth, after the Cohen Report was released on November 5, 2009, the Wollstein Reports were revised to include materially false and misleading statements about the Cohen Report.  For example, a Wollstein Report blasted by email on or about November 9, 2009 included a link to the Cohen Report next to Wollstein's signature, and stated:  "What's more, I'm not the only analyst to have spotted Americas Energy.  That multi million valuation I mentioned previously came from an independent source."

129.   The Wollstein Reports were materially misleading because the Cohen Report was not in fact independent since it was commissioned by Strebinger and paid for by Chapman.  Strebinger and Chapman were the orchestrators of both the Wollstein Reports and the Cohen Report.

130.   Fifth, the Wollstein Report disclaimers misleading stated that "Jarret Wollstein, the reviewer [or analyst], has been paid ten thousand dollars in compensation for preparing and publishing this report."  The disclaimers failed to disclose the material fact that Breckenridge, the principal drafter of the reports,

was paid approximately $49,975 to draft the report.  Chapman knew that Breckenridge had been paid for the report.

131.   Finally, the disclaimers also misleadingly stated that Wollstein was the purported reviewer or analyst, when in fact both Wollstein and Breckenridge acknowledged that Breckenridge was the principal "analyst" and drafter of the reports.

## 2. *False and misleading statements in the Cohen Report*

132.   The disclaimer in the Cohen Report stated that "Brent Chapman has paid $30,000 for this report/release/advertisement and its distribution," while also stating to investors as follows:  "Among the various sources and actions that a reader of our publications may easily avail himself or herself to are: (a) reviewing SEC periodic reports (Forms 10-Q and 10K [sic]), reports of material events (Form 8-K), insider reports (Forms 3, 4, 5 and Schedule 13D) and other SEC reports that are easily accessible at www.sec.gov . . . ."  Taken together, these statements were materially misleading to investors.

133.   The Cohen Report failed to adequately disclose a conflict of interest relating to the funding of the report.   Although the Cohen Report contained a disclaimer directing potential investors to review Schedule 13D reports of ownership on the

SEC's website for purposes of assessing conflicts of interest, the disclaimer misled

investors because it suggested that relevant information was available on the SEC's

website when it was not.

134.   Chapman and Strebinger knew that, at a minimum, they had not filed a

Schedule 13D to report their own respective beneficial ownerships of Americas

Stock.

135.   The disclaimer was materially misleading because it failed to state that

Chapman and his colleague Strebinger directly or indirectly owned substantial

shares of the Stock that they were already selling at the time of the release of the

Cohen Report.

136.   Strebinger and Chapman knew, or were reckless in not knowing, this

information with respect to at least their respective holdings of Stock, and they

knew that they did not file required Schedule 13D reports, which could have

revealed to inquiring investors the roles that Chapman and Strebinger played in the

creation and distribution of the Cohen Report.

137.   These omissions were material because a reasonable investor would have

wanted to know that the behind-the-scenes promoters of the Stock were actively

selling the Stock while at the same time paying millions of dollars for writers and distributors to actively promote the Stock.

**F.    Strebinger and Chapman Sell $17 Million in Americas Stock while Directing the Stock Promotion**

138.   Strebinger and Chapman, directly or indirectly, collectively acquired 6,158,000 shares of Americas Stock in private transactions and then sold the Stock on the public market for $17 million beginning in September 2009.

139.   At the same time they were selling the Stock, Strebinger and Chapman were directing a massive campaign to promote the Stock.

140.   Strebinger and Chapman coordinated their fraudulent scheme through the California Attorney and the Securities Attorney.

141.   At the time that Strebinger and Chapman began directly or indirectly acquiring Stock, there was no reported public trading in the Stock.  The last known public trade had been on or about January 16, 2008, and involved a trade of 100 shares at $0.25 per share.

142.   In July 2009, when Americas publicly disclosed the Merger Announcement, the trading volume did not increase.  On September 3, 2009, when Americas disclosed the definitive Merger Agreement, the trading volume did not increase.

143.   The bid prices for the Stock in July and August 2009 generally were in the range of $0.10 per share.

144.   Then, beginning on or about three business days before the start of the stock promotion on September 14, 2009, Muskateer sold 150,000 shares of Stock on the public market.

145.   On or about Wednesday, September 9, 2009, Muskateer sold 10,000 shares of Stock at $0.40 per share, through an account maintained with a U.S. brokerage firm.  The U.S. brokerage firm purchased the Stock in a proprietary account.  The transactions were the only known trades of the day.  The Stock price closed at $0.40.

146.   On or about Thursday, September 10, 2009, Muskateer sold 20,000 shares of Stock at $0.50 per share through the U.S. brokerage firm, and the U.S. brokerage firm purchased the Stock in a proprietary account.  Canadian trading data indicates that, on the same day, a Canadian resident purchased 10,000 shares of Stock at $0.50 per share, through a Canadian brokerage firm.

147.   Strebinger knew this Canadian resident.  In fact, Strebinger apparently paid this individual CDN$120,000, as a purported loan, in June 2009.  The Muskateer

and Canadian transactions were the only known trades of the day.  The Stock price closed at $0.50.

148.   On or about Friday, September 11, 2009, Muskateer sold 10,000 shares of Stock at $0.60 per share, which apparently cleared through a Canadian brokerage firm.  The Canadian resident purchased 10,000 shares of Stock at $0.60 per share, through a Canadian brokerage firm.

149.   Muskateer also sold 110,000 shares of Stock at $0.7122 per share through the U.S. brokerage firm, and the U.S. brokerage firm purchased the Stock in a proprietary account.

150.   In addition, three Canadian individuals/entities and one U.S. resident collectively purchased 125,000 shares of Stock at prices ranging from $0.60 to $0.77 per share.  At least two of the Canadian purchasers know Strebinger.  The Stock price closed at $0.70.

151.   Strebinger and/or his associates coordinated these relatively small, incremental trades with the intent to walk up the trading volume and price to build momentum for the upcoming promotion.

152.   In addition, on Thursday, September 10, 2009 (i.e., the same day that Muskateer sold and the Canadian resident purchased Stock), Americas and the

Tennessee Company issued a press release announcing the execution of the definitive Merger Agreement.

153.   Yet, Americas already had filed a Form 8-K/A to disclose the execution of the Merger Agreement on September 3.  The press release was timed to prime the market for Defendants' upcoming promotion.  The California Attorney, who represented Strebinger and Chapman, reviewed the press release in advance of its distribution and arranged for its release.

154.   On Monday, September 14, 2009, the first day of the Initial Wollstein Report blast, the Stock price closed at $0.94, up 33%.  The closing price was just shy of the $1.00 per share predicted by ghostwriter Breckenridge in his e-mail to ostensible author Wollstein dated August 6, 2009, in which Breckenridge stated to Wollstein that Americas shares "will open at $1."

155.   Strebinger told Breckenridge that Americas shares would open near $1.00. Strebinger knew that Americas shares would open near $1.00 because he was planning to increase the Stock price to close to $1.00 at the time of the start of the promotion.

156.   Once the promotion began, the trading volume and the Stock price rose swiftly.  By the end of the first week, the closing price increased to $1.02.  By the end of September 2009, the closing price was $1.35.

157.   As the promotion increased, the price fluctuated generally upward and trading volume increased dramatically.  For example, on October 1, 2009, the price closed at $1.53 and by November 2, the price closed at $1.75.

158.   On November 5, 2009, the date of the Cohen Report, the price closed at $1.67.  The next day, the price closed at $1.91.  The price reached a closing high of $5.21 in February 2010.

159.   During the promotional period, Americas also issued a number of press releases on a variety of topics, including the issuance of the Cohen Report.  The California Attorney reviewed and arranged for the distribution of all or substantially all of the press releases for at least the first few months of the promotion.

160.   When the promotion began in September 2009, Americas had 20,504,595 shares of Stock issued and outstanding.  During the promotion, Muskateer, Furla, Lance and Chapman collectively sold 6,185,000 of those shares, or 30% of the public float, for more than $17 million.

161.   The Stock was sold in relatively small amounts over extended periods, which better disguised the dumping of the Stock.  The sales were executed and cleared through multiple brokerage firms in at least the United States and Canada.

### 1.   *Strebinger, Muskateer and Furla acquire and sell Americas Stock*

162.   Through Strebinger, Muskateer and Furla acquired and sold 2,485,000 shares of Stock for $4.9 million.

163.   Muskateer sold 1,385,000 shares of Stock from September 9, 2009 through October 20, 2009, for $2.1 million.  Muskateer also sold 100,000 shares of Stock on February 8, 2010, for $462,000.

164.   Strebinger purchased 1,385,000 shares of Stock from 20 Americas shareholders before the Merger Announcement, and Muskateer sold those shares through a Swiss financial institution.

165.   The 20 shareholders were the same shareholders to whom Strebinger wrote personal checks from March to May 2009.  Neither Strebinger nor Muskateer informed the Transfer Agent of the purchases.

166.   At all such times, the 1,385,000 shares represented 6.7% of the 20,504,595 shares of Stock then issued and publicly disclosed.  Neither Strebinger nor

Muskateer filed a Schedule 13D to report their direct or indirect beneficial ownership of the shares.

167.   Transfer agent records show that a block of 100,000 shares of Stock owned of record by seven Americas shareholders were put in street name on January 26, 2010.  On February 8, 2010, Muskateer sold 100,000 shares of Stock through its Swiss account.

168.   Strebinger is the "beneficial owner" of Muskateer's assets deposited with the Swiss financial institution.

169.   Furla sold 1,000,000 shares of Americas Stock from December 15, 2009 through December 23, 2009, for $2.3 million.

170.   Furla acquired 1,000,000 shares of Stock from Strebinger's Wife, who acquired the shares through a transaction facilitated by the Securities Attorney. Documents provided to the Transfer Agent show that the Securities Attorney requested, on "instructions from our client," that 1,000,000 shares of Americas Stock be transferred to Strebinger's Wife.

171.   Strebinger's Wife is the "beneficial owner" of Furla's assets deposited with the Swiss financial institution.  Strebinger controlled Furla.

172.   Strebinger and Muskateer were beneficial owners of more than 5% of Americas Stock because they directly or indirectly had or shared voting power and investment power over a block of at least 6.7% of Americas Stock.  Neither Strebinger nor Muskateer filed a Schedule 13D at any time to report the acquisition or disposition of the Stock.  Consequently, they unlawfully failed to disclose publicly the information required by Schedule 13D, including their identities and their plans with respect to the Stock.

## 2.   *Chapman and Lance acquire and sell Americas Stock*

173.   Chapman directly and/or indirectly acquired 3,700,000 shares of Americas Stock in private transactions during the scheme.

174.   Chapman directly and/or indirectly sold the Stock on the public market for over $12 million.

175.   Lance sold 1,000,000 shares from September 25, 2009 through January 4, 2010, for $2.5 million through a Swiss financial institution.  When Lance's sales commenced, the shares represented 4.9% of Americas Stock.  Chapman was the sole "beneficial owner" of Lance's assets deposited with the financial institution in Switzerland.

176.   Chapman sold 900,000 shares of Stock from September 25, 2009 through November 18, 2009, for $1.6 million.  Chapman sold an additional 900,000 shares of Stock from January 11, 2010 through January 21, 2010, for $3.9 million. Finally, Chapman sold 900,000 shares of Stock from January 20, 2010 through February 1, 2010, for $3.8 million.

177.   Chapman sold these shares through an individual account with a brokerage firm located in the Turks and Caicos Islands.  Chapman delivered one stock certificate for 900,000 shares of Stock no later than September 4, 2009, representing 4.4% of Americas Stock.

178.   Chapman delivered two more stock certificates, totaling 1,800,000 shares, no later than December 7, 2009.  Those shares represented 8.7% of Americas Stock.

179.   Chapman instructed the owner of the brokerage firm to sell all of the shares as expeditiously as possible.  The owner used multiple U.S. brokerage firms to sell the Stock for Chapman at times and in amounts that the brokerage firm owner believed would not disrupt the public market for the shares.

180.   Chapman was the beneficial owner of more than 5% of Americas Stock because he directly had voting power and investment power over a block of at least

8.7% of the Stock.  Chapman did not file a Schedule 13D at any time to report the acquisition or disposition of the Stock.  Consequently, he unlawfully failed to disclose publicly the information required by Schedule 13D, including his identity and plans with respect to the Stock.

181.   Strebinger's Wife, Furla, Lance, and Muskateer were all unjustly enriched as a result of Defendants' fraudulent scheme.

182.   As the promotion waned, the Stock price and trading activity gradually decreased.  By the end of May 2010, after the promotion stopped, the price closed at $1.58.  By September 14, 2010, one year after the promotion began, the price closed at $0.67.  By December 2011, Americas was bankrupt and its Stock was worthless.

## COUNT I—FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

183.   Paragraphs 1 through 182 are hereby re-alleged and are incorporated herein by reference.

184.   From at least May 2009 through April 2010, Defendants Strebinger and Chapman, in the offer and sale of the securities described herein, by the use of means

and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

185.   Defendants Strebinger and Chapman knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

186.   While engaging in the course of conduct described above, Defendants Strebinger and Chapman acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

187.   By reason of the foregoing, Defendants Strebinger and Chapman, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II—FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

188.   Paragraphs 1 through 182 are hereby re-alleged and are incorporated herein by reference.

189.   From at least May 2009 through April 2010, Defendants Strebinger and Chapman, in the offer and sale of the securities described herein, by use of means

and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

      a.    obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      b.    engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities,

all as more particularly described above.

190.   By reason of the foregoing, Defendants Strebinger and Chapman, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III—FRAUD

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]

191.   Paragraphs 1 through 182 are hereby re-alleged and are incorporated herein by reference.

192.   From at least May 2009 through April 2010, Defendants Strebinger and Chapman, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

      a.      employed devices, schemes, and artifices to defraud;

      b.      made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      c.      engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

193.   Defendants Strebinger and Chapman knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, Defendants Strebinger and Chapman acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

194.   By reason of the foregoing, Defendants Strebinger and Chapman, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### COUNT IV—FAILURE TO DISCLOSE BENEFICIAL OWNERSHIP

**Violations of Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2(a) thereunder**
**[15 U.S.C. § 78m(d); 17 C.F.R. §§ 240.13d-1 & 240.13d-2(a)]**

195.   Paragraphs 1 through 182 are hereby re-alleged and are incorporated herein by reference.

196.   Exchange Act Section 13(d)(1) [15 U.S.C. § 78m(d)(1)] and Rule 13d-1 [17 C.F.R. § 240.13d-1] provide that any person who "directly or indirectly" becomes the "beneficial owner" of more than 5% of a class of registered securities must file a Schedule 13D with the Commission within 10 days of the acquisition.  Exchange Act Section 13(d)(2) [15 U.S.C. § 78m(d)(2)] and Rule 13d-2(a) [17 C.F.R. § 240.13d-2(a)] require that any Schedule 13D be amended "promptly" if there is a "material change" in ownership.

197.   Defendants Strebinger, Chapman and Muskateer, after acquiring directly or indirectly the beneficial ownership of more than 5% of a class of equity securities

registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], failed to file with the Commission a statement containing the information required by Schedule 13D [17 C.F.R. § 240.13d-101].

198.   By reason of the foregoing, Defendants Strebinger, Chapman and Muskateer violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Exchange Act Rules 13d-1 and 13d-2(a) [17 C.F.R. §§ 240.13d-1 & 240.13d-2(a)].

## COUNT V

**Liability under Section 20(b) of the Exchange Act for Violations of Section 17(a) of the Securities Act, Sections 10(b) and 13(d) of the Exchange Act and Exchange Act Rules 10b-5, 13d-1 and 13d-2(a)**
**[15 U.S.C. §§ 78t(b)]**

199.   Paragraphs 1 through 182 are hereby re-alleged and are incorporated herein by reference.

200.   From at least May 2009 through April 2010, Defendants Strebinger and Chapman violated Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)] by knowingly or recklessly commissioning, funding, and arranging for the broad distribution of materially false and misleading information through or by means of research reports authored by third persons that were intended for prospective investors.

201.   By knowingly or recklessly disseminating materially false and misleading information through or by means of promotional reports authored by third persons, Defendants Strebinger and Chapman, directly or indirectly and knowingly or recklessly, engaged in acts through or by means of third parties that would have been unlawful for Defendants Strebinger and Chapman to do themselves under Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

202.   By knowingly or recklessly disseminating materially false and misleading information through or by means of promotional reports authored by third persons, Defendants Strebinger and Chapman, directly or indirectly and knowingly or recklessly, engaged in acts through or by means of third parties that would have been unlawful for Defendants Strebinger and Chapman to do themselves under Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)].

203.   By knowingly or recklessly disseminating materially false and misleading information through or by means of promotional reports authored by third persons, Defendants Strebinger and Chapman, directly or indirectly and knowingly or recklessly, engaged in acts through or by means of third parties that would have been unlawful for Defendants Strebinger and Chapman to do themselves under Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)].

## COUNT VI—AIDING AND ABETTING

### Aiding and Abetting Violations of Section 10(b), 13(d), and 20(b) of the Exchange Act and Rules 10b-5, 13d-1 and 13d-2(a)

204.   Paragraphs 1 through 182 are hereby re-alleged and are incorporated herein by reference.

205.   From at least May 2009 through April 2010, Defendant Strebinger knowingly provided substantial assistance to Defendant Chapman's violations of Section 10(b), 13(d) and 20(b) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d) & 78t(b)] and Rules 10b-5, 13d-1 and 13d-2(a) thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1 & 240.13d-2(a)], and therefore is liable as an aider and abettor.

206.    Unless restrained and enjoined, Defendant Strebinger will continue to aid and abet Chapman's violations of Sections 10(b), 13(d) and 20(b) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d) & 78t(b)] and Rules 10b-5, 13d-1 and 13d-2(a) thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1 & 240.13d-2(a)].

## COUNT VII—AIDING AND ABETTING VIOLATION

### Aiding and Abetting Violations of Section 10(b), 13(d), and 20(b) of the Exchange Act and Rules 10b-5, 13d-1 and 13d-2(a)

207.   Paragraphs 1 through 182 are hereby re-alleged and are incorporated herein by reference.

208.   From at least May 2009 through April 2010, Chapman knowingly provided substantial assistance to Strebinger's violations of Section 10(b), 13(d) and 20(b) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d) & 78t(b) ] and Rules 10b-5, 13d-1 and 13d-2(a) thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1 & 240.13d-2(a)], and is liable as an aider and abettor.

209.   Unless restrained and enjoined, Chapman will continue to aid and abet Strebinger's violations of Sections 10(b), 13(d) and 20(b) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d) & 78t(b)] and Rules 10b-5, 13d-1 and 13d-2(a) thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1 & 240.13d-2(a)].

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Commission respectfully prays for:

### **I.**

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that the defendants named herein committed the violations alleged herein.

### **II.**

Permanent injunctions enjoining Defendants Strebinger, Chapman, their officers, agents, servants, employees, and attorneys from violating, directly or

indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(d), and 20(b) of the Exchange Act [15 U.S.C. §§78j(b), 78m(d) & 78t(b)] and Rules 10b-5, 13d-1 and 13d-2(a) thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1 & 240.13d-2(a)].

## III.

A permanent injunction enjoining Defendant Strebinger from aiding and abetting Chapman from violating, directly or indirectly, Sections 10(b), 13(d), and 20(b) of the Exchange Act [15 U.S.C. §§78j(b), 78m(d) & 78t(b)] and Rules 10b-5, 13d-1 and 13d-2(a) thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1 & 240.13d-2(a)].

## IV.

A permanent injunction enjoining Defendant Chapman from aiding and abetting Strebinger from violating, directly or indirectly, Sections 10(b), 13(d), and 20(b) of the Exchange Act [15 U.S.C. §§78j(b), 78m(d) & 78t(b)] and Rules 10b-5, 13d-1 and 13d-2(a) thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1 & 240.13d-2(a)].

## V.

A permanent injunction enjoining Muskateer, its officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Section 13(d) of the Exchange Act [15 U.S.C. § 78t(b)] and Rules 13d-1 and 13d-2(a) thereunder [17 C.F.R. §§ 240.13d-1 & 240.13d-2(a)].

## VI.

An order requiring an accounting by Defendants and Relief Defendants of the use of proceeds of the fraudulent conduct described in this Complaint and requiring the disgorgement by Defendants and Relief Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

## VII.

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)] imposing civil penalties against Defendants.

## VIII.

An order prohibiting Defendants from destroying, altering, concealing or removing documents.

## IX.

An order requiring Defendants and Relief Defendants to repatriate all assets obtained from the activities described in the Complaint that are now located outside the territorial limits of the United States, and directing each Defendant and each Relief Defendant to return such assets to the Registry of the Court, pending conclusion of this matter.

## X.

An order permanently barring Defendants from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

## XI.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

Plaintiff requests a jury trial.


Dated: November 3, 2014

Respectfully submitted,

*/s/ Kristin B. Wilhelm*
Kristin B. Wilhelm
Senior Trial Counsel
Georgia Bar No. 759054
Tel: (404) 842-7655
Email: wilhelmk@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
Tel: (404) 842-7622

COUNSEL FOR PLAINTIFF
Securities and Exchange
Commission
950 East Paces Ferry Road, N.E.
Suite 900
Atlanta, Georgia 30326
Tel: (404) 842-7600
Fax: (404) 842-7666